UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:24-cv-02701-JAK (DFMx) | Date | March 30, 2026 |
| Title | Gary Mazmanian et al. v. LCPTracker, Inc. | | |

| | |
|---|---|
| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |

| | |
|---|---|
| M. Lindaya | Not Reported |
| Deputy Clerk | Court Reporter / Recorder |

| | |
|---|---|
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** **(IN CHAMBERS) ORDER RE MOTION FOR ORDER PRELIMINARILY APPROVING CLASS ACTION SETTLEMENT (DKT. 34)**

## I. Introduction

On December 14, 2024, Gary Mazmanian ("Mazmanian") filed this putative class action against LCPTracker, Inc. ("LCP" or "Defendant"). Dkt. 1. On April 9, 2025, Mazmanian and Michael McGuinness ("McGuinness") (collectively, "Plaintiffs") filed a First Amended Complaint ("FAC"), which is the operative one, against Defendant on behalf of a putative class. Dkt. 21. The FAC alleges that Defendant failed to secure and safeguard the personally identifiable information ("PII") of Plaintiffs and similarly situated individuals, and that this information was stolen in a data breach. *Id.*

On July 16, 2025, the parties participated in a private mediation with the Judge David E. Jones (Ret.). Dkt. 26. On July 22, 2025, the parties reached a settlement in principle. *Id.*

On December 8, 2025, Class Plaintiffs filed the following: (i) a Notice of Motion and Unopposed Motion for Order Preliminarily Approving Class Action Settlement, Dkt. 34 ("Motion"); (ii) the Settlement Agreement, Dkt. 34-1; and (iii) a Joint Declaration of Class Counsel in Support of the Motion, Dkt. 34-2. On December 11, 2025, Plaintiffs filed a proposed order granting the Motion. Dkt. 36.

A hearing on the Motion was held on February 2, 2026. Based on the colloquy with counsel at that hearing, a decision on the Motion was deferred until Plaintiffs filed supplemental briefing as to the following matters:

> The supplemental briefing shall include additional information as to why the total amount of the settlement is fair and reasonable, the information that will be available to members of the putative class as to the total amount of potential recovery, as well as the recovery by individual members of the putative class with respect to specific claims for documented losses and claims that do not require any submission by the members of the putative class. The briefing shall also address the reasonableness of the proposed awards of $3000 to each representative of the putative class, and the award of 33% of the gross settlement amount as attorney's fees. The submission as to attorney's fees shall conform to the Court's Standing Order for formatting such fee requests by task, attorneys who performed the task, and the combined lodestar amount. The submission shall also include support for the reasonableness of the hourly rates for each attorney or legal assistant.

Dkt. 38.

The hearing on the Motion was continued to March 16, 2026. *Id.*

On March 4, 2026, Plaintiffs filed their Supplemental Briefing in Support of Plaintiffs' Motion for Preliminary Approval. Dkt. 39 ("Supplemental Briefing"). In support of the Supplemental Briefing, they filed declarations by Plaintiffs (Dkts. 39-1, 39-2) and counsel Gregory Haroutunian (Dkt. 39-3), as well as tables with the lodestar information underlying the request for an award of attorney's fees (Dkt. 39-4).

On March 16, 2026, the continued hearing on the Motion was held. Dkt. 42. At that hearing, the Court stated that it was inclined to grant the Motion, subject to reductions in the possible range of attorney's fees and service awards. *Id.* After discussing these issues with counsel, there were no objections to the tentative modifications.

For the reasons stated in this Order, the Motion is **GRANTED-IN-PART**.

## II. <u>Background</u>

### A. The Parties

Mazmanian is a resident and citizen of California. Dkt. 21 ¶ 10. McGuinness is a resident and citizen of Texas. *Id.* ¶ 11.

Defendant is alleged to be a California corporation whose principal place of business is in Orange, California. *Id.* ¶ 12. Defendant provides payroll reporting software, construction site compliance management, and workforce reporting services. Dkt. 34-1 ¶ 1. As a part of Defendant's business practices, it stores the PII of its clients, permitted users' employees, and

vendors. *Id.*

B. Allegations in the FAC

The FAC alleges that, on November 22, 2024, Defendant sent Class Plaintiffs notification letters informing them that their PII, which Defendant had maintained in its system, had been compromised due to a data breach. Dkt. 21 ¶¶ 2, 63. The notification letters stated that Defendant discovered "unusual activity" on August 20, 2024, and later determined that unauthorized persons had gained access to and downloaded certain files with such PII between August 14 and August 20, 2024 (the "Data Incident"). *Id.* ¶ 3.

It is alleged that, after the Data Incident, Mazmanian has been the victim of several fraudulent charges made on certain of his personal accounts, which have required him to spend substantial time and effort to address. *Id.* ¶¶ 67, 68, 72. It is also alleged that he has suffered from stress and anxiety due to the heightened risk of ongoing harm due to this identity theft and financial fraud. *Id.* It is also alleged that he expects to have to continue to spend time and incur expenses going forward to seek to mitigate the harms caused to him by the Data Incident. *Id.* ¶ 70.

It is alleged that McGuinness is very careful about sharing his PII. *Id.* ¶ 74. After receiving the letter from Defendant about the Data Incident, he allegedly spent a significant amount of time on efforts to mitigate the harm he had experienced and could suffer going forward, including researching and verifying the Data Incident. *Id.* ¶ 77. It is alleged that he has seen an increase in spam calls, texts, and/or emails directed to his accounts, which he believes were due to the Data Incident. *Id.* ¶ 79. It is further alleged that McGuinness has experienced anxiety and stress to the heightened risk of ongoing harm due to this identity theft and financial fraud. *Id.* It is also alleged that he expects to have to continue to spend time and incur expenses going forward to seek to mitigate the harms caused to him by the Data Incident. *Id.* ¶¶ 80-81.

Defendant continues to maintain Plaintiffs' PII. *Id.* ¶ 69.

**III. <u>Summary of Settlement Agreement and Notice</u>**

A. Class Definition

The Settlement Agreement defines the "Settlement Class" as follows:

> All United States residents to whom Defendant sent an individual notification that they were affected by the Data Incident.

Dkt. 34-1 ¶ 59. It is estimated that the PII of approximately 40,963 of Defendant's clients and the employees of its permitted users, vendors, and other persons,  was compromised through the

Data Incident. Dkt. 34 at 2.

The following persons are excluded from the Settlement Class: (1) all persons who are directors, officers, and agents of Defendant, or their respective subsidiaries and affiliated companies; (2) governmental entities; and (3) the Judge assigned to the Action, that Judge's immediate family, and Court staff. Dkt. 34-1 ¶ 59.

A "Settlement Class Member" is any member of the Settlement Class who has not opted out of the settlement. Dkt. 34-1 ¶ 60.

B. Relief to Settlement Class Members and Other Obligations

1. <u>Settlement Cash Benefits and Payment Plan</u>

Under the Settlement Agreement, Defendants will provide a cash payment of $495,000 (the "Settlement Fund"), which is non-reversionary. *Id.* ¶ 62. Members of the Settlement Class may choose one of two options -- Cash Payment A or Cash Payment B -- in seeking payment from the Settlement Fund.

(a) Cash Payment A – Documented Losses

Cash Payment A would provide up to $2500 to a Settlement Class Member for reasonable documented losses related to the Data Incident. Dkt. 34-1 ¶ 69. Settlement Class Members will be required to submit reasonable documentation to support the claim of having incurred such losses. The Settlement Agreement defines this as "documentation contemporaneously generated or prepared by a third party supporting a claim for expenses paid." Documentation may include telephone records, correspondence such as emails as well as receipts. It does not include personal certifications or declarations as documentation. Further, expenses are only reimbursable if they have not already been paid to the Settlement Class Member by another source, including compensation provided in connection with the credit monitoring and identity theft protection product offered previously when Defendant notified persons of the Data Incident. *Id.*

(b) Cash Payment B – Pro Rata Cash

Cash Payment B would provide an estimated $50.00 *pro rata* cash payment to any Settlement Class Member, regardless of whether the person submitted a claim for Cash Payment A. The amount of Cash Payment B is subject to an adjustment. Thus, it may be changed to a higher or lower *pro rata* amount based on the total number of claims, and the amount of funds remaining in the Settlement Fund after deductions for Notice and Administration; attorney's fees and litigation costs; service awards; credit monitoring, and payments made to those who seek Cash Payment A. *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:24-cv-02701-JAK (DFMx) | Date | March 30, 2026 |
| Title | Gary Mazmanian et al. v. LCPTracker, Inc. | | |

2. Nonmonetary Benefits – Credit Monitoring

The Settlement Agreement also provides that Settlement Class Members may exercise an option to receive credit monitoring. Dkt. 34-1 ¶ 69. This option would provide, at no cost to the Settlement Class Member, two years of credit monitoring and identity theft protection by CyEx Identity Defense Complete. *Id.* ¶ 26. The identity theft protection will include $1,000,000 of insurance against identity theft. *Id.* ¶ 69.

3. Pro Rata Increases and Decreases from the Settlement Fund

The Settlement Agreement provides that cash payments are subject to a *pro rata* increase or decrease from the Net Settlement Fund depending on the availability of funds. *Id.* The "Net Settlement Fund" is the amount of the Settlement Fund following payment of administration costs; service awards;[1] and attorney's fees and costs. *Id.* ¶ 40. Settlement Class members may receive a *pro rata* increase of cash payments if the amount of valid claims is insufficient to exhaust the entire Net Settlement Fund, or a decrease if the amount of valid claims exhausts the amount of the net settlement fund. *Id.* When calculating any *pro rata* increase or decrease, the funds will be distributed first for payment of credit monitoring, then for Cash Payment A, then to those who elect Cash Payment B. *Id.* ¶ 69.

4. Fees and Payments Deducted from Settlement Fund

The Settlement is not contingent on court approval of the request for an award of attorney's fees and costs or service awards. *Id.* ¶ 101.

(a) Class Representatives' Service Awards

The Settlement Agreement provides for service awards up to $3000 for "Class Representatives," who are the Plaintiffs who are approved to serve as representatives on behalf of the Settlement Class. *Id.* ¶¶ 25, 99. Class Representatives may also receive payments from the Settlement Fund in the same manner as other Settlement Class Members. *Id.* ¶ 99.

(b) Attorney's Fees

Class Counsel have applied for an award of attorney's fees of up to one-third of the Settlement Fund, as well as a reimbursement of litigation costs. *Id.* ¶ 100; Dkt. 39.

[1] The Settlement Agreement defines the Net Settlement Fund as the amount of the Settlement Fund minus administration costs and attorney's fees and costs. Dkt. 34-1 ¶ 40. At the continued hearing on the Motion, counsel confirmed that the amount of Service Awards is also deducted from the Settlement Fund to calculate the Net Settlement Fund.

(c) Administration Costs

Costs of settlement administration will also be covered by the Settlement Fund. Dkt. 34-1 ¶ 66.

* * *

The allocation of the Settlement Fund is summarized in the following table:

| Description of Amount | Proposed Amount | Percentages |
|---|---|---|
| **Settlement Fund** | **$495,000** | **100%** |
| Attorneys' Fees (up to 33% of the Maximum Settlement Amount) | $163,350 | 33% |
| Service Awards | $6000 ($3000 for each Class Representative) | 1.2% |
| Settlement Administration | Unknown | Unknown |
| **Net Settlement Fund** | **Unknown** | **Unknown** |
| Credit Monitoring | $5899 | 1.1% |
| Cash Option A | Up to $2500 for each class member for reasonable documented losses, pro rata if insufficient funds remain after payments for credit monitoring | |
| Cash Option B | Pro rata remainder after payments for credit monitoring and Cash Option A | |

5. Residual Funds

The Settlement Agreement provides that if there are residual funds in the Settlement Fund 240 days after the date Settlement Class Members were sent an email instructing them to elect their form of payment, such funds shall be distributed to the Electronic Frontier Foundation, a 501(c)(3) non-profit. *Id.* ¶ 102.

6. Injunctive Relief

The Settlement Agreement provides that Defendant will provide Class Counsel with a written attestation regarding security measures that it has or will implement following the Data Incident to protect the private information of Settlement Class Members. The costs of any security measures will be paid by Defendant independent of the Settlement Fund. *Id.* ¶ 69.

C. Notice

The "Notice Program" consists of the methods provided in the Settlement Agreement for giving notice to the Settlement Class. *Id.* ¶ 42. These methods include a Postcard Notice and Long Form Notice. *Id.*

1. Content of Settlement Class Notice

Under the Settlement Agreement, a court-approved Postcard Notice and Long Form Notice will be sent to Settlement Class Members.

The "Postcard Notice" would include the following information:

(a) a description of the material terms of the settlement;
(b) how to submit a Claim Form;
(c) the Claim Form deadline;
(d) the last day for Settlement Class Members to opt-out of the Settlement Class;
(e) the deadline for Settlement Class Members to object to the Settlement and/or Application for Attorneys' Fees and Costs;
(f) the Final Approval Hearing date; and
(g) the Settlement Website address at which Settlement Class Members may access the Settlement Agreement and other related documents and information.

*Id.* ¶ 76.

Postcard Notices are to be mailed to the addresses of the Settlement Class Members. *Id.* ¶ 49. The Settlement Administrator will perform reasonable address traces for Postcard Notices returned as undeliverable. *Id.* ¶ 81.

The "Long Form Notice" would also include the procedure that Settlement Class Members can use to opt out of the Settlement Class. *Id.* at ¶ 78. The Postcard Notice would direct Settlement Class members to review the Long Form Notice for instructions on how to opt out. *Id.*

2. Notice Plan

Under the Settlement Agreement, the Settlement Administrator would begin the Notice Program within 30 days of entry of the preliminary approval order. *Id.* ¶ 75. The Notice Program is to be completed no later than 45 days before the original date set for the hearing during which the Court will consider granting final approval of the settlement ("Final Approval Hearing"). *Id.* ¶ 82.

3. Opt-Outs and Objections

(a) Opt-Outs

A Settlement Class Member may opt out of the Settlement Class at any time until the opt out deadline by submitting the request electronically through a website created to provide information about the settlement ("Settlement Website") or by mailing an opt out request to the Settlement Administrator. *Id.* ¶ 78. The opt out deadline is 30 days before the date the Final Approval Hearing is initially scheduled. *Id.* ¶ 45.

The opt out request must be personally signed by the Settlement Class Member and contain the person's name, address, telephone number and email address (if any). *Id.* ¶ 78.

(b) Objections

Settlement Class Members may also object to the Settlement and/or application for attorney's fees and costs. *Id.* at ¶ 79. Objections can be submitted through the Settlement Website or by mail sent to the Settlement Administrator by the objection deadline. *Id.* The Settlement Agreement provides that the deadline to make an objection would be 30 days before the date on which the Final Approval Hearing is scheduled. *Id.* ¶ 44.

Objections must contain the following information:

a. The objector's full name, mailing address, telephone number, and email address (if any);
b. All grounds for objection, accompanied by any legal support for the objection known to the objector or objector's counsel;
c. The number of times the objector has objected to a class action settlement within the five years preceding the date in which the objector filed the objection, the caption of each case in which the objector has made an objection, and a copy of any orders related to or ruling upon the objector's prior objections;
d. The identity of all counsel who represent the objector, including any former or current counsel who may be entitled to compensation for any reason related to the objection to the settlement and/or application for attorney's fees and costs;
e. The number of times in which the objector's counsel and/or counsel's law firm have objected to a class action settlement within the five years preceding the date of the filed objection, the caption of each case in which counsel or the firm has made such objection, a copy of any orders related to or ruling upon counsel's or the counsel's law firm's such prior objections;
f. Whether counsel representing the objector will appear at the Final Approval Hearing;
g. A list of persons who will be called to testify at the Final Approval Hearing in support of the objection;

h. A statement confirming whether the objector intends to personally appear and/or testify at the Final Approval Hearing;
i. The objector's signature.

*Id.* ¶ 80. The Settlement Agreement provides that Class Counsel and/or Defendant's Counsel may conduct limited discovery with respect to any objector or that person's counsel. *Id.*

D. Release of Claims

Settlement Class Members who do not opt out of the Settlement Agreement would expressly waive all rights under Cal. Civ. Code § 1542. *Id.* ¶ 104. That statute provides:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

Cal. Civ. Code § 1542.

Settlement Class Members also waive provisions and rights of any law(s) that are comparable in effect to Cal. Civ. Code § 1542, including without limitation, Cal. Civil Code § 1798.80, *et seq.*, Montana Code Ann. § 28- 1-1602; North Dakota Cent. Code § 9-13-02; and South Dakota Codified Laws § 20-7-11. Dkt. 34-1 ¶ 104.[2]

Those who opt out of the settlement prior to the opt out deadline do not release any claims arising out of the Data Incident. *Id.* ¶ 105. The Settlement Agreement will provide the exclusive remedy for any and all released claims of Plaintiffs and Settlement Class Members who do not opt out. *Id.* ¶ 106.

E. Distribution of Benefits

The Settlement Agreement provides that the benefits to Settlement Class Member benefits shall be distributed no later than 75 days after entry of the order granting final approval of the settlement ("Final Approval") or 30 days after the Effective Date of the Settlement Agreement, whichever is later. *Id.* ¶ 93. The Effective Date of the settlement is the day after the entry of the Final Approval Order, if no objections are made to the settlement. If there are objections, the Effective Date is the later of: (a) 30 days after entry of the Final Approval Order if no appeals are taken from the Final Approval Order; or (b) if appeals are taken from the Final Approval Order,

[2] Although the Settlement Agreement states that "Plaintiffs" waive these provisions, at the continued hearing on the Motion, both parties confirmed that all Settlement Class Members are subject to the release of claims provision.

then the earlier of 30 days after the last appellate court ruling affirming the Final Approval Order or 30 days after the entry of a dismissal of the appeal. *Id.* ¶ 32. Cash payments will be made by electronic payment or paper check. *Id.* ¶ 94.

## IV. <u>Analysis</u>

### A. Class Certification

#### 1. <u>Legal Standards</u>

The first step in considering whether preliminary approval of the Settlement Agreement should be granted is to determine whether a class can be certified. "[T]he Ninth Circuit has taught that a district court should not avoid its responsibility to conduct a rigorous analysis because certification is conditional: Conditional certification is not a means whereby the District Court can avoid deciding whether, at that time, the requirements of the Rule have been substantially met." *Arabian v. Sony Elecs., Inc.*, No. 05-CV-1741, 2007 WL 627977, at *2 n.3 (S.D. Cal. Feb. 22, 2007) (quoting *In re Hotel Tel. Charges*, 500 F.2d 86, 90 (9th Cir. 1974)). "When, as here, the parties have entered into a settlement agreement before the district court certifies the class, reviewing courts 'must pay undiluted, even heightened, attention to class certification requirements.'" *Staton v. Boeing Co.*, 327 F.3d 938, 952–53 (9th Cir. 2003) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998), overruled on other grounds by *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)).

That the parties have reached a settlement "is relevant to a class certification." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619 (1997). Consequently, when

> [c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems for the proposal is that there be no trial. But other specifications of the Rule—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context. Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.

*Id.* at 620 (internal citations omitted). "In the context of a request for settlement-only class certification, the protection of absentee class members takes on heightened importance." *Gallego v. Northland Grp. Inc.*, 814 F.3d 123, 129 (2d Cir. 2016) (citing *Amchem*, 521 U.S. at 620).

The first step for class certification is to determine whether the proposed class meets each of the requirements of Fed. R. Civ. P. 23(a). *Dukes*, 564 U.S. at 350–51; *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). These are: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a)(1)–(4). Further, "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 564 U.S. at 350. If these four prerequisites are met, the proposed class must meet one of the requirements of Fed. R. Civ. P. 23(b). *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Plaintiffs rely on Rule 23(b)(3). *See* Dkt. 34 at 18. It provides, in relevant part, that a class proceeding "may be maintained" if "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

2. Application

(a) Fed. R. Civ. P. 23(a) Requirements

(1) Numerosity

Rule 23(a)(1) requires that a class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "'[I]mpracticability' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Estates*, Inc., 329 F.2d 909, 913–14 (9th Cir. 1964) (quoting *Advert. Specialty Nat'l Ass'n v. FTC*, 238 F.2d 108, 119 (1st Cir. 1956)). Although there is no specific numeric requirement, courts generally have found that a class of at least 40 members is sufficient. *See Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010); *In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 634 (C.D. Cal. 2009).

Class counsel declares that the putative class includes approximately 40,963 persons. Dkt. 34-2 ¶ 28. This is sufficient to satisfy the numerosity requirement.

(2) Commonality

Rule 23(a)(2) provides that a class may be certified only if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality requires a showing that the "class members 'have suffered the same injury,'" *Dukes*, 564 U.S. at 350 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)), and "does not mean merely that they have all suffered a violation of the same provision of law." *Id.* The class claims must "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one

of the claims in one stroke." *Id.* "Rule 23(a)(2) has been construed permissively. All questions of fact and law need not be common to satisfy the rule." *Hanlon*, 150 F.3d at 1019. In assessing commonality, "even a single common question will do." *Dukes*, 564 U.S. at 359 (internal quotation marks omitted). In general, the commonality element is satisfied where the action challenges "a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005).

Plaintiffs contend that commonality is satisfied because there are common questions of law and fact regarding whether Defendant failed to implement and maintain reasonable security procedures. Dkt. 34 at 19. These questions arise from a common event, the Data Incident. *Id.* This is sufficient to satisfy the required showing of common questions of fact and law. *See e.g. In re 23andMe, Inc. Customer Data Sec. Breach Litig.*, No. 24-MD-3098, 2024 WL 4982986, at *13 (N.D. Cal. Dec. 4, 2024) ("Common questions exist because the customers were subject to the same data breach; plus, there are common questions related to the breach such as whether 23andMe could have had better security policies to protect customer information and whether 23andMe responded to the data breach appropriately.").

(3) <u>Typicality</u>

The typicality requirement is met if the "representative claims are 'typical,'" *i.e.,* "if they are reasonably co-extensive with those of absent class members." *Hanlon*, 150 F.3d at 1020. Representative claims "need not be substantially identical." *Id.* The test of typicality is whether "other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon*, 976 F.2d at 508 (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985)). Like commonality, typicality is construed permissively. *Hanlon*, 150 F. 3d at 1020. The commonality and typicality requirements of Rule 23(a) tend to merge. *Dukes*, 564 U.S. at 349 n.5.

Plaintiffs allege that typicality is satisfied because the claims and defenses of Plaintiffs mirror those of the members of the putative class. Dkt. 34 at 20. Because Plaintiffs' claims arose from the same data breach as other putative class members', the typicality requirement is satisfied. See *In re 23andMe Data Sec. Breach Litig.*, 2024 WL 4982986, at *13.

(4) <u>Adequacy</u>

Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020. "Adequate representation

depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011). "Adequacy of representation also depends on the qualifications of counsel." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1007 (9th Cir. 2018) (citing *In re N. Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 855 (9th Cir. 1982), abrogated on other grounds by *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996)). "[T]he named representative's attorney [must] be qualified, experienced, and generally capable to conduct the litigation . . . ." *Id.* (quoting *Jordan v. L.A. Cty.*, 669 F.2d 1311, 1323 (9th Cir.), vacated on other grounds by 459 U.S. 810 (1982)).

There is no evidence that Plaintiffs have interests that are antagonistic to those of the other putative Settlement Class Members.

Plaintiffs' counsel declares that they have diligently worked to identify and investigate potential claims in this case, have extensive experience handling data breach class actions and the types of claims asserted in this case, have extensive knowledge of the applicable law, and have resources committed to representing the Settlement Class. Dkt. 34-2 ¶ 34. Counsel also declare that they took care to ensure that relief was allocated commensurate to the value of each putative Settlement Class Member's respective claims. *Id.* ¶ 31.

For the purpose of class certification, the adequacy of Plaintiffs as well as Plaintiffs' counsel has been shown. Whether the proposed award of attorney's fees and service awards for plaintiffs appointed as Class Representatives is proper is discussed below with respect to whether the Settlement Agreement is reasonable and fair.

(b) Rule 23(b)(3) Requirements

(1) <u>Predominance</u>

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623. The predominance analysis assumes that the Rule 23(a)(2) commonality requirement has already been established, *Hanlon*, 150 F.3d at 1022, and "focuses on whether the 'common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication.' " *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557 (9th Cir. 2019) (quoting *Hanlon*, 150 F.3d at 1022). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 William Rubenstein, *Newberg on Class Actions* § 4:50, at 196–97 (5th ed. 2012)). Where the issues of a case "require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3)

action would be inappropriate." *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1778 at 535–39 (2d ed. 1986)).

"Predominance is not, however, a matter of nose-counting. Rather, more important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016) (internal citations omitted). "Therefore, even if just one common question predominates, 'the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately.'" *In re Hyundai*, 926 F.3d at 557–58 (quoting *Tyson Foods, Inc.*, 577 U.S. at 453). Further, the requirements of Fed. R. Civ. P. 23(b)(3) "must be considered in light of the reason for which certification is sought—litigation or settlement . . . ." *Id.* at 558. A class may be certifiable for settlement even though it "may not be certifiable for litigation" where "the settlement obviates the need to litigate individualized issues that would make a trial unmanageable." *Id.*

As noted, Plaintiffs' claims arise from the same Data Incident and involve the same questions of law and fact as those of the putative Settlement Class Members. These questions do not turn on an assessment of individual facts, and are capable of resolution on a classwide basis. *See also*, *23andMe Data Sec. Breach Litig.*, 2024 WL 4982986, at *14 (finding predominance satisfied where class claims "revolve around the data breach to which all class members were subject as well as [defendant's] security policies and response to the data breach"). Accordingly, the predominance requirement is satisfied.

(2) <u>Superiority</u>

Rule 23(b)(3) requires a showing that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This issue is evaluated by considering the following factors: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.*

The benefits of resolving the claims at issue in a class action support certification. There are more than 40,000 individuals who may be members of the Settlement Class. The claims of each of them arise from the same Data Incident. It is in the interest of judicial and party efficiency to adjudicate the claims in a class proceeding. The cost of individual litigation of claims would be substantial. Further, there is nothing to suggest that the management of this class proceeding will be difficult.

* * *

For these reasons, the factors presented by Fed. R. Civ. P. 23(b)(3) support certification of a class as the superior means to resolve the claims underlying this action. In light of this disposition and the facts identified with respect to adequacy, *supra*, the request to appoint Plaintiffs as Class Representatives is **GRANTED**. Similarly, the request to appoint Plaintiffs' counsel as Class Counsel is **GRANTED**.

B. Preliminary Approval of Settlement Agreement

1. Legal Standards

Class action settlements must be approved by a court to ensure that class counsel and the class representatives do not place their own interests above those of the absent class members. *Dennis v. Kellogg Co.*, 697 F.3d 858, 861 (9th Cir. 2012); *see also* Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class may be settled . . . only with the court's approval."). If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering various factors. Fed. R. Civ. P. 23(e)(2).

Courts generally employ a two-step process in evaluating a class action settlement. *Lilly v. Jamba Juice Co.*, No. 13-CV-02998, 2015 WL 1248027, at *6 (N.D. Cal. Mar. 18, 2015).

*First,* courts make a "preliminary determination" concerning the merits of the settlement – that is whether it is fundamentally fair, adequate, and reasonable. *Id.* (citing Manual for Complex Litigation, Fourth § 21.632 (FJC 2004)).

*Second,* after preliminary approval, courts must hold a hearing pursuant to Federal Rule of Civil Procedure 23(e)(2) to make a final determination of whether the settlement is "fair, reasonable, and adequate."

"At the preliminary approval stage, the settlement need only be potentially fair." *Stiner v. Brookdale Senior Living, Inc.*, No. 17-CV-0396, 2025 WL 1676276, at *4 (N.D. Cal. June 13, 2025) (quoting *Uschold v. NSMG Shared Servs., LLC*, 333 F.R.D. 157, 169 (N.D. Cal. 2019). This is due, in part, to the policy preference for settlement, particularly in the context of complex class action litigation. *See Officers for Just. v. Civ. Serv. Comm'n of City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982) ("[V]oluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation . . . .").

/ / /

As the Ninth Circuit has explained:

> [T]he court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.

*Id.*

In evaluating fairness, a court must consider "the fairness of a settlement as a whole, rather than assessing its individual components." *Lane v. Facebook, Inc.*, 696 F.3d 811, 818–19 (9th Cir. 2012). A court is to consider and evaluate several factors as part of its assessment of a proposed settlement. The following non-exclusive factors, which originally were described in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026-27 (9th Cir.1998), are among those that may be considered during both the preliminary and final approval processes:

> (1) the strength of the plaintiff's case;
> (2) the risk, expense, complexity, and likely duration of further litigation;
> (3) the amount offered in settlement;
> (4) the extent of discovery completed and the stage of the proceedings;
> (5) the experience and views of counsel;
> (6) any evidence of collusion between the parties; and
> (7) the reaction of the class members to the proposed settlement.

*Id.* at 819.

Amended Fed. R. Civ. P. 23(e) provides further guidance as to the requisite considerations in evaluating whether a proposed settlement is fair, reasonable and adequate. It provides that a court is to consider whether:

> (A) the class representatives and counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3);[3] and
(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

The factors set forth in Fed. R. Civ. P. 23(e) distill the considerations historically used by federal courts to evaluate class action settlements. *See* Fed. R. Civ. P. 23(e) advisory committee's note to 2018 amendment. As the comments of the Advisory Committee explain, "[t]he goal of [the] amendment [was] not to displace any factor" that would have been relevant prior to the amendment, but rather to address inconsistent "vocabulary" that had arisen among the circuits and "to focus the court and the lawyers on the core concerns" of the fairness inquiry. *Id.*

C. Application

1. <u>Whether the Class Representatives and Plaintiffs' Counsel Have Adequately Represented the Class</u>

As discussed above in connection with class certification, Class Representatives and Class Counsel have adequately represented the Settlement Class.

Generally, "[t]he extent of the discovery conducted to date and the stage of the litigation are both indicators of [Class] Counsel's familiarity with the case and of Plaintiffs having enough information to make informed decisions." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008). In this action, a settlement was reached quickly, and before an answer to the FAC was filed. However, Class Counsel declares that the Settlement Agreement was only entered after "significant investigation" and informal discovery as to the claims of the Plaintiffs and Settlement Class Members. Dkt. 34-2 ¶¶ 11, 18.

Although this matter settled quickly and without formal discovery, this does not show or imply that Class Counsel did not adequately represent the putative class. Indeed, a speedy resolution of an action may support a contrary inference. Further, there is no showing that the value of the Settlement Agreement suggests that Class Counsel were not capable. These circumstances are similar to those that other district courts have evaluated in concluding that class counsel were adequate. *See Grant v. T-Mobile USA, Inc.*, No. 21-CV-2268, 2023 WL 7308311, at *7 (C.D. Cal. Oct. 3, 2023) ("Though, as noted, the case was not exactly hotly-litigated, the Court concludes Plaintiff and her counsel adequately represented the class. They achieved a significant monetary outcome by way of the settlement. There is nothing to suggest inadequacy."); *Kearney v. Hyundai Motor Am.*, No. 09-CV-1298, 2013 WL 3287996, at *6 (C.D. Cal. June 28, 2013) ("The Court recognizes that settlement occurred before class certification or

---

[3] Fed. R. Civ. P. 23(e)(3) provides that "[t]he parties seeking approval must file a statement identifying any agreement made in connection with the proposal."

any other dispositive motions were filed with the Court. However, the parties have shown that they have spent significant time investigating this action to allow for an informed decision, but not so much time that the settlement amount will be unnecessarily depleted by extensive costs and fees. Accordingly, the Court finds that this factor favors preliminarily approving the Settlement Agreement.").

2. Whether the Settlement was Negotiated at Arm's Length

Courts evaluate the settlement process as well as the terms to which the parties have agreed to ensure that "the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties." *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) (quoting *Hanlon v. Chrysler Corp.*,150 F.3d 1011, 1027 (9th Cir. 1998)). The Ninth Circuit has noted that the "potential for collusion reaches its apex pre-class certification because, among other things, (1) the court has not yet approved class counsel, who would owe a fiduciary duty to the class members; and (2) plaintiffs' counsel has not yet devoted substantial time and money to the case, and may be willing to cut a quick deal at the expense of class members' interests." *Briseno v. Henderson*, 998 F.3d 1014, 1024 (9th Cir. 2021). Obvious deficiencies in a settlement agreement may include "any subtle signs that class counsel have allowed pursuit of their own self-interests to infect the negotiations." *McKinney-Drobnis v. Oreshack*, 16 F.4th 594 (9th Cir. 2021) (quoting *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1043 (9th Cir. 2019)).

Three terms in a proposed settlement agreement in a class proceeding may raise concerns of collusion: (1) "when counsel receive[s] a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded"; (2) "when the parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds"; and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) (internal quotation marks and citations omitted).

None of these concerns applies here. Nor are there any other facts suggesting fraud, overreaching, or collusion in the negotiations between Class Counsel and counsel for the Defendant. The Settlement Agreement was reached after a full day mediation with an experienced neutral, followed by subsequent discussions. Dkt. 34-2 ¶ 12. All Settlement Class Members will receive monetary recovery and the option to have credit monitoring. Dkt. 34-1 ¶ 69. The Settlement Agreement is not contingent on either the amount of attorney's fees ultimately awarded to Class Counsel, or the amount of the Service Awards approved for the Class Representatives. *Id.* ¶ 101. There is also no "clear sailing" provision. *Id.* ¶ 100. There is also no reversion to Defendant. *See id.* ¶ 101.

Accordingly, for the purpose of preliminary approval, there is a sufficient basis to conclude that the parties negotiated the Settlement Agreement at arm's length and in good faith.

3. Whether the Relief Provided for the Class is Adequate

(a) Strength of the Claims of the Class Representatives, and the Costs, Risks, and Delays of Trial and Appeal

The Class Representatives contend that the strength of their claims is uncertain, because "there have been no data breach cases tried to verdict, and only a handful of cases have achieved class certification." Dkt. 34 at 27 (quoting *In re PostMeds, Inc. Data Breach Litig.*, No. 23-CV-5710, 2024 WL 4894293, at *6 (N.D. Cal. Nov. 26, 2024)). Class Counsel declare that, absent a settlement further litigation in this matter would be complex, costly, and likely to continue for several years with no guarantee of relief for Settlement Class Members. Dkt. 34-2 ¶ 29. They also acknowledge that there is a risk that Defendant could prevail if this matter went to trial. *Id.*

Based on the foregoing, this factor weighs in favor of preliminary approval.

(b) Effectiveness of Any Proposed Method of Distributing Relief to the Class

The proposed method of notifying Settlement Class Members is fair and reasonable. The Notice Program would provide a Postcard Notice by mail and a Long Form Notice. Both state how Settlement Class Members should submit claims, and both are available on the Settlement Website. Dkt. 34-1 ¶¶ 42, 63. In addition, the Settlement Class Members may submit claims through the Settlement Website or by U.S. mail. *Id.* ¶ 84. For Settlement Class Members to receive reimbursement for expenses incurred, they must submit documentation, including telephone records, correspondence including emails, or receipts. The documentation must have been contemporaneously generated at the relevant time or prepared by a third party. *Id.* ¶ 69.

The proposed process for submitting claims and receiving payments is not unduly burdensome, and it should be effective in distributing relief to the Settlement Class. Therefore, this factor weighs in favor of preliminary approval.

(c) Terms of Any Proposed Award of Attorney's Fees

The Settlement Agreement provides for an award of attorney's fees to Class Counsel in an amount up to one-third of the Settlement Fund. *Id.* ¶ 100. However, the Settlement Agreement is not contingent upon the Court's approval of this fee award. *Id.* ¶ 101.

A request for an award of attorney's fees of 33% of the Settlement Fund is not unusual. As noted, there is no evidence of collusion between counsel for the parties, and there is no reversion to the Defendant. *See In re 23andMe Data Sec. Breach Litig.*, 2024 WL 4982986, at *24 (granting preliminary approval despite concerns about the amount of attorneys' fees where "if, the amount of fees requested is not rewarded, no money reverts to [defendant]"). An analysis

of the amount of a potential award of attorney's fees is discussed in Section V, *infra.*

(d) Any Other Agreements Made in Connection with the Proposal

There is no evidence that there is any other agreement between the parties related to the Settlement Agreement. See Dkt. 34-1.

(e) Appropriateness of the Settlement Amount

The Class Representatives were directed to provide supplemental briefing providing the basis for their position that the Settlement Amount is reasonable. *See* Dkt. 38. The Class Representatives did so and contend that the Settlement Amount "represents a significant recovery that is comparable, and generally higher, than other similar data breach class action settlements." Dkt. 39 at 20 (citing *Orrick, Herrington & Sutcliffe LLP Data Breach Litigation*, No. 23-CV-4089 (N.D. Cal.) ($12.54 per person settlement value); *In re Afni, Inc. Data Breach Litigation*, No. 22-CV-1287 (C.D. Ill.) ($7.08 per person settlement value); *Tucker v. Marietta Area Health Care, Inc.*, No. 22-CV-184 (S.D. Ohio) ($8.08 per person settlement value); *Thomsen v. Morley Companies, Inc.*, No. 22-CV-10271 (E.D. Mich.) ($6.19 per person settlement value); *Philips v. Baybridge*, No. 23-CV-22 (W.D. TX) ($10 per person settlement value)).

The Class Representatives also contend that the Settlement Amount will be sufficient to fund anticipated claims by the Settlement Class. Dkt. 39 at 25. For Cash Payment A, which covers documented losses up to $2500, the Class Representatives cite data showing that there have been 422 million individual exposures of personal data in the United States (although no time period is stated), and that approximately 1.43 million persons, which is .39% of the total, have been harmed by identity theft in the last year. Dkt. 39 at 26–27 (citing the Identity Theft Resource Center's 2022 Annual Report and Experian). The Class Representatives calculate a corresponding .39% rate of identity theft victims among members of the Settlement Class as 159 Class Members. *Id.* The Class Representatives also cite the Federal Trade Commission Identity Theft Survey Report for its determination that the average out-of-pocket loss for identity theft victims who experienced the misuse of their existing accounts is $500, while the average loss for improperly opened accounts is $1200. *Id.* at 27. Accordingly, the Class Representatives estimate that if 159 Settlement Class Members suffered $1000 in out-of-pocket losses, $159,000 would go towards Cash Payment A recipients, leaving substantial funds for Cash Payment B. *Id.* at 28. These assumptions are instructive, but do not ensure that this will be the allocation between Cash Payment A and Cash Payment B. For example, it is not clear that the cited data included within the calculation of average loss the "fees for credit reports, credit monitoring, or freezing and unfreezing your credit" and "cost to replace your IDs" that may be recovered as part of Cash Payment A. Dkt. 34-1 at 64.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 8:24-cv-02701-JAK (DFMx) | Date | March 30, 2026 |
|---|---|---|---|
| Title | Gary Mazmanian et al. v. LCPTracker, Inc. | | |

The Class Representatives also contend that they expect the claims rate to be between .5% and 9% based on historical data from similar class action settlements. *Id.* They expect a very high percentage of these claims will be seeking Class B Payments. *Id.* Class Counsel declare that, based on their experience in similar cases, the Settlement Fund will likely provide relief equal to 100 percent of compensable losses, and to recompense valid individual claims filed by Settlement Class Members. Dkt. 39-3 ¶ 12.

Taking all of the foregoing into account, including the treatment of the cost for Credit Monitoring,[4] there is a sufficient showing that the Settlement Amount should be sufficient to cover claims that will be presented by Settlement Class Members.

4. <u>Whether the Proposal Treats Settlement Class Members Equitably Relative to Each Other</u>

As noted, the Settlement Agreement provides for the reimbursement of Settlement Class Members for documented out-of-pocket expenses of up to $2500 that were caused by the Data Incident. Dkt. 34-1 ¶ 69. As also noted, a Settlement Class Member who seeks such a Cash Payment A Payment, may also make a claim for a Cash Payment B, which would be for $50, assuming that there are sufficient funds to pay that amount to all who apply. Further, all Settlement Class Members may elect to receive Credit Monitoring. *Id.* This allocation of settlement funds is fair and reasonable in that any Settlement Class Member who has sustained specific harm may receive corresponding compensation, and Settlement Class Members who did not will still receive some compensation.

Based on the foregoing, Settlement Class Members are treated equitably under the terms of the Settlement Agreement.

D. Appointment of Class Representative and Class Counsel

Because the Class Representatives and Class Counsel have been effective in their respective roles, both are approved to continue in those capacities.

E. Appointment of a Settlement Administrator

The Settlement Agreement provides that the Settlement Administrator shall be Simpluris, Inc. Dkt. 34-1 ¶ 57. Class Counsel shall oversee the Settlement Administrator. *Id.* ¶ 71. Class Counsel declare that Simpluris, Inc. was selected after a competitive bidding process, and is a well-respected and reputable third-party administrator with a "long history of successful class

---

[4] At the continued hearing, Class Counsel stated that credit monitoring would cost $5899, according to the bid by the Settlement Administrator. Class Counsel also confirmed that this amount would be deducted from the Settlement Fund.

action administration, including for data breach class action settlements." Dkt. 34-2 ¶ 16.

Based on the foregoing, it is determined that Simpluris, Inc. will be an appropriate administrator.

F. Notice

Rule 23(e)(1)(B) requires that a court "direct notice in a reasonable manner to all class members who would be bound by" a proposed class settlement. Fed. R. Civ. P. 23(e)(1)(B). Notice is satisfactory if it "generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (quoting *Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1352 (9th Cir. 1980)).

The Postcard Notice describes the material terms of the Settlement Agreement, as well as instructions on how to submit a timely claim form, object to the Settlement Agreement or opt out of the Settlement Class. Dkt. 34-1 ¶ 76. It will state the date and location for the hearing for Final Approval as well as the address of the website at which Settlement Class Members can access the Settlement Agreement and other related documents and information. *Id.*

The Settlement Agreement provides that Postcard Notices are to be mailed to the addresses that can be located for each Settlement Class Members. *Id.* ¶ 49. In addition, the Settlement Administrator would perform reasonable address traces for Postcard Notices returned as undeliverable. *Id.* ¶ 81.

The Long Form Notice will be posted on the settlement website. *Id.* ¶ 37. In addition to providing a summary of the material terms of the Settlement Agreement, and stating the process for submitting a claim, the Long Form Notice will also state the process for Settlement Class Members to opt-out or object to the Settlement. *Id.* ¶ 79. The Long Form Notice also explains that Settlement Class Members "won't be able to be part of any other lawsuit against LCPTracker about the issues that this Settlement Covers" and directs Settlement Class Members to the "Releases" section of the Settlement Agreement for more details. *Id.* at 64.

Based on review of the foregoing, it is determined that the plan for notice distribution is reasonable.

## V. Attorney's Fees

As noted, the Class Representatives and Class Counsel request an attorney's fees award of up to 33% of the settlement fund, which would total $165,000. *Id.* ¶ 100.

A. Legal Standards

Attorney's fees and costs "may be awarded . . . where so authorized by law or the parties' agreement." *In re Bluetooth Headset Prods.*, 654 F.3d at 941. However, "courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Id.* "If fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have [been] obtained." *Staton*, 327 F.3d at 964. Thus, a district court must "assure itself that the fees awarded in the agreement were not unreasonably high, so as to ensure that the class members' interests were not compromised in favor of those of class counsel." *Id.* at 965.

District courts have discretion to choose between a lodestar method and the percentage method to evaluate the reasonableness of a request for an award of attorney's fees in a class action. *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010). A court may also choose one method and then perform a cross-check with the other. *See*, *e.g.*, *Staton*, 327 F.3d at 973.

When using the percentage method, a court examines what percentage of the total recovery is allocated to attorney's fees. The Ninth Circuit applies a "benchmark award" of 25%. *Id.* at 968. However, awards above that benchmark may be approved if it is determined that they are reasonable in light of the overall circumstances. *See Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989) ("Ordinarily, . . . fee awards [in common fund cases] range from 20 percent to 30 percent of the fund created."); *Schroeder v. Envoy Air, Inc.*, No. CV-16-4911, 2019 WL 2000578, at *7 (C.D. Cal. May 6, 2019) (internal citations omitted) ("[T]he 'benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors,' " including " '(1) the results achieved; (2) the risks of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee; (5) the burdens carried by class counsel; and (6) the awards made in similar cases.' "). If a fee award significantly deviates from the 25% benchmark, the court must provide an "adequate explanation" based on the record. *In re California Pizza Kitchen Data Breach Litig.*, 129 F.4th 667, 679 (9th Cir. 2025).

"The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth*, 654 F.3d at 941. After the lodestar amount is determined, a trial court "may adjust the lodestar upward or downward using a 'multiplier' based on factors not subsumed in the initial calculation of the lodestar." *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000). A court has discretion to "adjust the lodestar upward or downward using a multiplier that reflects a

host of reasonableness factors, including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *Stetson v. Grissom*, 821 F.3d 1157, 1166-67 (9th Cir. 2016) (internal quotation marks and citation omitted).

B. Analysis

The Class Representatives and Class Counsel contend that 33% of the settlement fund is an appropriate fee award, citing other cases in this District in which similar awards were approved in data breach cases. *See Medoff v. Minka Lighting, LLC*, No. 22-CV-8885, 2024 WL 5275593, at *2 (C.D. Cal. July 10, 2024); *Koenig v. Lime Crime, Inc.*, No. 16-CV-503, 2018 WL 11358228, at *9 (C.D. Cal. Apr. 2, 2018). Class Counsel also state that, although their requested percentage is above the 25% benchmark in the Ninth Circuit, it is reasonable. In support of that position, they cite the results achieved, risk of litigation, skills required, quality of the work, contingent nature of the fee and financial burden, and awards made in similar cases. Dkt. 39 at 11–16.

They also contend that the lodestar cross-check confirms that the proposed fee award is reasonable. *Id.* at 16–20. To support this assertion, Class Representatives provide tables detailing hours spent by each attorney and paralegal, and their respective hourly rates. Dkt. 39-4. According to these calculations a reasonable lodestar is $176,521, which is greater than the proposed fee of $163,350.

1. <u>Results Achieved</u>

Class Counsel achieved a settlement of $495,000 for a class of 40,963 individuals. Dkt. 39 at 20. As stated above, the potential recovery for Settlement Class Members if this litigation were to continue to trial is uncertain. Thus, which party would prevail, and the amount of any actual recovery are both unknown. Class Counsel has also discussed the settlements in other class action cases involving data breach in which the pro rata benefit per class member was smaller than in this action. This provides some support for the approval of the request for attorney's fees that is above the 25% benchmark.

2. <u>Skills Required and Quality of Work</u>

Based on the briefing presented in support of the Motion, including the Supplemental Briefing, there is not a basis to conclude that the skills required, quality of work, or complexity of the issues were extraordinary. See *Azar v. Blount Int'l, Inc.*, No. 16-CV-483, 2019 WL 7372658, at *11 (D. Or. Dec. 31, 2019) (a "garden variety" case within a certain area of law that does not involve particularly unique or complex issues is less likely to support an upward variance from the benchmark on account of attorney skills). Accordingly, this factor does not support a fee award above the benchmark.

3. Contingent Nature of the Fee

"Courts have long recognized that the attorneys' contingent risk is an important factor in determining the fee award and may justify awarding a premium over an attorney's normal hourly rates." *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 457 (E.D. Cal. 2013). They have also recognized that in data privacy cases, which is an area of law that is still developing, a fee award above benchmark may be warranted. *See Medtronic*, 2025 WL 2934516, at *8.

4. Lodestar Cross-Check

Class Counsel have submitted evidence that reflects that collectively, attorneys from the four law firms that represented the putative Settlement Class, spent more than 213.7 hours on this action, which they contend was reasonable. They also state that their respective hourly rates, which range from $400 to $1,525 are reasonable, and that their application results in an appropriate lodestar of $176,521.00. Dkt. 39 at 17 (citing Dkt. 39-3 ¶¶ 21–22). This would represent a .93 negative multiplier to reach the 33% percentage award of $165,000. *Id.* Class Counsel contend that this lodestar was calculated by using the prevailing market rates in the relevant legal community. *Id.* at 18.

"In cases where courts apply the percentage method to calculate fees, they should use a rough calculation of the lodestar as a cross-check to assess the reasonableness of the percentage award." *In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act Litig.*, 295 F.R.D. 438, 460 (C.D. Cal. 2014). "The lodestar cross-check need not be as exhaustive as a pure lodestar calculation because it only serves as a point of comparison by which to assess the reasonableness of a percentage award." *Scott v. Blackstone Consulting, Inc.*, No. 21-CV-1470, 2024 WL 271439, at *11 (S.D. Cal. Jan. 24, 2024) (citation and quotation marks omitted).

As directed, Class Counsel provided a table that shows for each of the four law firms that represented plaintiffs, the attorneys or paralegals involved, their billing rates, and their hours worked for the principal categories of work that was performed. These are: administrative matters; drafting the complaint; settlement/mediation; motion practice/other pleadings). Dkt. 39-4. A review of these tables shows that, for purposes of a lodestar calculation, substantial modifications to the time spent on these tasks is warranted due to the number of attorneys who worked on each of them, and the total number of hours they spent collectively. The information that has been provided is summarized in the following table:

/ / /

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 8:24-cv-02701-JAK (DFMx) | Date | March 30, 2026 |
|---|---|---|---|
| Title | Gary Mazmanian et al. v. LCPTracker, Inc. | | |

| Cost by Firm | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Total Cost Per Activity | | | | | | | | |
| | Number of | Complaint | | Settlement / Mediation | | Motion Practice and Other Pleadings | | Administrative | | |
| Firm | Lawyers | Cost | Hours | Cost | Hours | Cost | Hours | Cost | Hours | |
| Stranch, Jennings & Garvey | 5 | $ 9,554.50 | 8.3 | $ 16,555.50 | 16.5 | $ 6,082.00 | 8.1 | $ 2,400.00 | 3.2 | |
| Millberg | 3 | $ 10,850.00 | 14.6 | $ 20,538.40 | 21.6 | $ 684.00 | 1.3 | $ 1,265.90 | 4.8 | |
| Kopelowitz Ostrow Ferguson | 2 | $ 2,740.00 | 5.2 | $ 15,555.00 | 18.1 | $ 12,740.00 | 14.2 | $ 190.00 | 0.2 | |
| Emery Reddy | 4 | $ 8,302.00 | 10.1 | $ 29,192.40 | 34.1 | $ 30,250.50 | 41 | $ 9,620.60 | 12.4 | |
| **Total** | **14** | **$ 31,446.50** | **38.2** | **$ 81,841.30** | **90.3** | **$ 49,756.50** | **64.6** | **$ 13,476.50** | **20.6** | |

The amount of time for each task is not reasonable for two reasons. First, more attorneys than were necessary worked on each of them. As shown in the table, combined, 14 attorneys performed the work. This is inherently inefficient because so many had to spend time getting prepared for each task, and then considered the same issues and reviewed the same materials. Second, the collective amount of time on each task is more than reasonable. This is confirmed by the small number of hours certain attorneys devoted to each task. Further, more than 38 hours were spent drafting the Complaint, more than 90 hours on the settlement process, and more than 60 hours on the work associated with the Motion. All of these amounts are greater than what is reasonable. That there were different complaints filed in separate actions, that were then combined into a single one, has been considered in assessing the reasonableness of the 38 hours.

With respect to the category of "Administrative," such tasks are not necessarily recoverable as attorney's fees. *See Nadarajah v. Holder*, 569 F.3d 906, 921 (9th Cir. 2009) (fees for clerical work should be "subsumed in firm overhead" rather than separately billed). Accordingly, hours performed for this category of tasks is not included.

With respect to the hourly rates, which as noted, ranged from $400 to $1,525, no meaningful information was provided to justify them. Thus, there was very limited information as to the years of experience of each attorney, or the rates that have been charged and paid by clients in similar matters. Nor was there information as to how these rates compared to those charged by attorneys with comparable experience in the relevant market.

In light of the foregoing, during the course of the review of these submissions, determinations were made as to a more reasonable number of hours, hourly rates and the corresponding, reasonable lodestar by task. It resulted in the following ranges by task:

| | |
|---|---|
| Complaint | $25,000 to $35,000 |
| Settlement | $40,000 to $65,000 |
| Motion | $25,000 to $35,000 |
| **Totals** | **$90,000 to $135,000** |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:24-cv-02701-JAK (DFMx) | Date | March 30, 2026 |
| Title | Gary Mazmanian et al. v. LCPTracker, Inc. | | |

For these reasons, it is determined that for purposes of preliminary approval, a reasonable award of attorney's fees is in the range from $90,000 to $135,000. The final amount will be determined in connection with the forthcoming motion for final approval, and based on any supplemental information provided by Class Counsel as well as a consideration of any objections that are filed.

## VI. <u>Service Awards</u>

The Settlement Agreement provides that Plaintiffs, if approved as Class Representatives, will each receive up to $3000 as a service award. Dkt. 34-1 ¶ 99.

### A. Legal Standards

"Incentive awards are fairly typical in class action cases." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). Such awards are "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Id.* at 958–59. When considering requests for case contribution awards, courts consider five factors: (1) the risk to the class representative in commencing suit, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation; (5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation. *Koenig v. Lime Crime, Inc.*, No.16-CV-503, 2018 WL 11358228, at *9 (C.D. Cal. Apr. 2, 2018) (citing *Van Vraken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995)).

### B. Analysis

The Class Representatives contend that they have been "active participants in this matter since its inception, expending considerable effort on behalf of the Settlement Class by, among other things: (1) meeting with their counsel at the outset of the case; (2) assisting with investigation of the facts; (3) reviewing the complaint prior to filing; and (4) consulting with their counsel during the litigation and settlement negotiations." Dkt. 39 at 29. Both Class Representatives have submitted declarations to support these statements. Dkts. 39-1, 39-2. Mazmanian declares that he has spent 10 hours fulfilling his responsibilities as a Class Representative, including by researching his rights and those of the Settlement Class Members, researching law firms, researching the Data Incident, communicating with Class Counsel and providing them with relevant information, and reviewing case documents. Dkt. 39-1 ¶ 10. McGuinness declares that he has spent eight hours to fulfill his responsibilities as a Class Representatives, performing the same tasks. Dkt. 39-2 ¶ 10.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:24-cv-02701-JAK (DFMx) | Date | March 30, 2026 |
| Title | Gary Mazmanian et al. v. LCPTracker, Inc. | | |

Based on these submissions, the requested awards would reflect an hourly rate of $375 for McGuiness and $300 for Mazmanian. These are substantial rates viewed in light of the work that each performed. Based on a review of the information provided, the very limited amount of litigation in this case, the absence of any evidence that either will be subject to any limitations of future employment due to their work in this action, it has been determined that separate Service Awards for Mazmanian and McGuiness in the range of $1000 to $ 2500 is approved for purposes of the Motion with the final amount to be determined in connection with the forthcoming motion for final approval, and based on any supplemental information provided as to their services and any objections that are filed.

## VII. Conclusion

For the reasons stated in this Order, the Motion is **GRANTED-IN-PART**. A Final Approval Hearing is set for August 24, 2026, at 11:30 a.m., Pacific Time. The following dates are adopted for the steps prior to the hearing on the anticipated motion for final approval:

| **Event** | **Date** |
|---|---|
| Notice to the class is issued | April 6, 2026 |
| Defendant funds settlement administration costs | April 16, 2026 |
| Notice Program commences; Postcard Notices mailed and Settlement Website live | May 1, 2026 |
| Joint status report due including proposed deadline for objections, hearing date on Final Approval | 60 days after the Issuance of this Order |
| Deadline to file Motion for Final Approval of Settlement; Motion for Attorney's Fees, Reimbursement of Litigation Expenses, and Class Representatives' Service Awards | July 9, 2026 |
| Deadline for any Objection to Motion for Final Approval and for potential Settlement Class Members to opt-out | July 24, 2026 |
| Deadline for Settlement Class Members to submit claims | August 8, 2026 |
| Final Approval Hearing | August 24, 2026, at 11:30 a.m. |

_____ : _____

Initials of Preparer LC1